May it please the Court. My name is Mark Caldwell. I'm appearing this morning on behalf of Ms. Brumfield in this social security disability case. Preliminarily, I will keep track of my own time, but I would like the Court's permission to reserve two minutes for rebuttal if possible. There are several issues in this case, but I think I'd like to address the dispositive one, and that is the assessments of the treating physicians versus the evidence relied upon by the agency, which was the assessment of a non-examining state agency physician who can't be identified by name, about whom we know nothing about his professional qualifications, and gave essentially no explanations whatsoever for the assessment form that he completed. By comparison, we have a treating physician assessment, actually two, that resulted in vocational expert testimony that a person with those limitations would be unable to sustain work. And, of course, as the Court knows, sustainability is the key in a social security case, meaning the ability to maintain work-related activities on a regular and continuing basis, eight hours a day, five days a week, under social security ruling 96-8P. We have two doctors. One is the primary care physician, Dr. Freeburg, and one is the rheumatologist, Dr. Fairfax. Now, what impressed me about Dr. Freeburg was the methodical way he went about ultimately reaching the diagnosis of fibromyalgia. He had blood tests, rheumatoid factor to rule out polymyalgia rheumatica. He had sedimentation rate to rule out other diseases, such as lupus and other autoimmune diseases. He sent the claimant for a cervical MRI, which came back relatively benign. And, of course, he referred the claimant to Dr. Fairfax, who was the rheumatologist who eventually came up with the diagnosis of fibromyalgia. Now, we also ‑‑ Is there a dispute over whether she had fibromyalgia? No. No. No one's questioned it. Even the administrative law judge listed that as among the severe impairments in the case. He simply went on to disparage the severity of that. Now, in doing so, the administrative law judge, by definition, had to discount the opinions of the primary care physician and the rheumatologist. Elsie would have decided otherwise, because his own vocational expert testified that those limitations preclude sustained work. And he did so in Dr. Fairfax's case by saying, well, his records don't support any limitations. Now, there's two problems with that. First of all, to a certain extent, it's factually untrue. Dr. Fairfax did an examination that showed the trigger points that are the hallmark of fibromyalgia. And two, and I think this is a big one because it hits both of the treating physicians' assessments, he talks about the fact there's no functional limitations in the records themselves. Right. But I guess what's bothering me is that fibromyalgia itself is not disabling. I mean, you don't just assume that because somebody has fibromyalgia that they can't sustain work. I agree with that. And so you need to have some explanation beyond just the diagnosis of fibromyalgia in order to support a conclusion that this person can't do sustained work. I agree with that, too. Okay. So I guess my problem is in the records of the treating physicians that you're relying on, where is the supporting explanation, documentation, reason for the conclusion that this person can't sustain work? Is there? What is it? Okay, I think I see your point. And I agree with it in the sense that, you know, you just can't say, well, here's your diagnosis, you have multiple sclerosis, or here's your diagnosis, you have fibromyalgia, or whatever the case may be. If it were, then these cases would be pretty simple. Establish the diagnosis and you're done. Well, and if it's conclusionary, I mean, an ALJ can look to that, right? You're not going to say that every conclusionary diagnosis an ALJ has to accept. No, but this ALJ did accept this one, so I don't think we need to worry about that under the facts of this case. But, you know, I want to hit the Social Security statute, 42 U.S.C. 423D, because that's really what a claimant has to show. A claimant has to show a medically determinable impairment, there's no doubt we have that here, the ALJ said so, that could reasonably be expected to lead to some degree of symptoms. And then that section of the statute goes on to say, as established by statements of the treating physician and the claimant as to the severity thereof. And that's the distinction, Judge Schroeder, with what you're telling me, you're talking to me about. It's the diagnosis, I'll call it a medically determinable impairment, because that's the term of art, related to the severity of the results from that diagnosis. And what this court said in the Orn case, I think it was, was, you know, you don't look at treating records. No, I'm asking you very specifically about this record. What is there in the documents of the treating physician that you're relying on that explains why she can't do sustained work? Well, he talks about the diagnosis, and I'm not saying that that alone establishes the disability, but it does establish the underlying impairment. And then he does talk in his records about how she has ups and downs. I think the word he used was flares, which is characteristic of fibromyalgia. And then, of course, when he was asked specifically, and this is different from just treatment records, you know, what's the severity here? Well, he gave very specific ratings as to the severity. And that's all that a claimant needs to do under both the statute and one of my favorite cases, Lester and Smolin, is to show that there's that connection. And here there's no doubt that there's that connection. So then the question becomes, are the reasons the ALJ gave for discounting the treating physician's opinion sufficient? And I think they're insufficient for the reasons I've just mentioned. Well, I'm already coming at this in the wrong direction, but what you're offering up as the basis in the record to support the conclusion just strikes me as the conclusion. I mean, I look at the form that, well, I guess your office sent to the doctor, and certainly there are checkmarks in certain places. But when I go back and look at what he'd recorded prior to that time, I don't see descriptions that support the checkmarks. So I think the ALJ looks at this and says, I don't see descriptions that support the checkmarks. These checkmarks are conclusions. That's not enough. That isn't what the ALJ said, Your Honor. The ALJ said that the treating physician records did not contain functional assessments. And, you know, as you know, under Conant and all the other cases, we have to look at the four corners of the ALJ decision. That's the rationale he gave. That's the rationale this Court condemned as recently as the Orn case. I do see I'm coming up on my two minutes. And with the Court's permission, may I reserve? Yes, you may. Thank you. Thank you. Good morning. My name is Anne Maley, and I represent the agency, the Social Security Administration. I'd like to address a couple of the points that Appellant raised. He talked a lot about the treating physician's opinions. The ALJ also relied on the claimant's own testimony, and she testified that she could perform a number of daily activities that were exertional in nature. For example, she testified that she volunteered up to 40 hours a month. She went door to door explaining her faith to other people. She testified that she cooked and she cleaned and she shopped, and also she exercised at home. She exercised at the gym. She took a one-week trip. She socialized. She drove. No, I just don't. She's still a human being. You don't have to give up your entire life, and you don't have to stop eating. And some people can't afford to have people do these things for them. So I don't see how the fact that she could water her plants every three days or manage to put together a meal or get to the store means that supports a conclusion that she can do sustained work for eight hours a day or whatever it takes. Sure, and the ALJ did not rely on that alone, but nevertheless, it's not insignificant that she could do a number of exertional activities. And there's no evidence that she received any help from anyone. Well, did she ultimately get benefits subsequently? Yes. In 2007, there was a subsequent favorable decision. She received SSI benefits. Of course, that ALJ had completely different evidence. She applied in 2005. The record of that case is not in this record, but the decision indicates that there were certainly different doctors weighing in, although some of the doctors may have overlapped also. But does that have any effect on this? Absolutely none, Your Honor. Absolutely none. The fact that the claimant could demonstrate that she was disabled at a later time period, this decision was in 2004. Her date last insured here was 2003, and her onset date was 2002. Going way forward in the future, in 2005, she applied for SSI benefits, and then in 2007, the ALJ found she was disabled from 2005 until 2006. So perhaps her condition worsened. That decision talked about her mental impairment a lot. In this case, she has very little evidence of a severe disabling mental impairment. But back to the treating physician's opinions that the appellant has focused on. There were nine doctors who weighed in on this case with opinions or findings. Only two of those doctors found that the claimant was disabled. Those were Drs. Freeburg and Fairfax. Those opinions were conclusory. Those opinions did not list any functional limitations. They did not explain how they got to the result that they got to. With regard to Dr. Freeburg, the primary care physician, there are some treatment notes indicating he did treat her. He indicates she had pain. He indicates she was depressed. Those notes run from April 2004 until ‑‑ excuse me, April 2002 until April 2004. If you look at the notes carefully, in June of 2003, he says that she was doing well with intermittent flares. Then in December 2003, six months later, he indicates he doesn't make any indication of pain. There's only an indication of depression. Fast forward to April 2004, we have this form he fills out indicating she's totally disabled without any explanation at all. That's Dr. Freeburg. With Dr. Fairfax, there are only two documents in the record from Dr. Fairfax. The first document from September 2002 is a note on a prescription pad that says the claimant is disabled. Well, of course, the ALJ doesn't have to rely on that. There's absolutely no explanation. Then a year later, September 2003, there is an opinion from Dr. Fairfax. Two‑page long opinion. He does examine her. But if you look at what he says, they're largely normal findings. He talks about her muscle tone being normal. The only hint that she has a problem is that he indicates there's multiple tender points and maybe a few other things that relate to her tender points. But in terms of the severity, that's simply not demonstrated in Dr. Freeburg's report nor in Dr. Fairfax's report. And those are the only doctors that claim that the claimant is disabled. Well, is there clear and convincing reasons articulated for rejecting the opinions that are rejected in the opinion? Yes. The ALJ is required to articulate specific and legitimate reasons, and he does. He indicates that with Dr. Freeburg, he simply doesn't provide any medical evidence to back up what he says. And the same with Dr. Fairfax. He says it's unsupported and it's inconsistent. The ALJ did rely on the state agency doctor's opinion. The ALJ can do that when the state agency doctor's opinion is consistent with other record evidence. It's not the only thing the ALJ relied on, but he relied on the state agency doctor who discussed the EMG test, a nerve conduction test. Or any of the other doctors that were relied on examining doctors. Yes. The ALJ talked about Dr. Drinkwater's report. Dr. Drinkwater examined the claimant and found that she had only mild symptoms. Dr. Drinkwater opined that the claimant could perform medium work. Having looked at most of the record, the state agency determined that light work was a better residual functional capacity for the claimant. The state agency doctor's opinion was consistent with a treating doctor, Dr. Mora, who examined the claimant on one occasion. He also agreed she had fibromyalgia and carpal tunnel. He did not assess any functional limitations. He did not say she was disabled. He talked about the same nerve conduction test that did the state agency doctor and said that her symptoms might improve with splinting. He didn't assess extreme limitations. He thought that splinting would help her, and if not, that she should come back. So I think a review of the record shows that substantial evidence supports the ALJ's decision that the claimant could perform light work and her past work as a file clerk. Does the Court have any other questions? Are there any questions? Just five things I want to quickly respond to in serial order, if I may. The claimant's testimony regarding her daily activities is a reason to reject her statement. Obviously, I agree with Judge Callahan on that. But what's always strange to me about that is when an ALJ does that, he's saying she's telling the truth about her daily activities. So because she's telling the truth about her daily activities, I'm going to find she doesn't tell the truth. I don't understand that, never have. Do many claimants lie by understating what they've done, or do they lie by overstating what they've done? Well, actually, what the judge says in a case like this is they're not overstating or understating. They're telling me the absolute truth about what they do or don't do. And because they're telling me the absolute truth about what they do or don't do, I'm going to find that they're not credible. Commissioner's counsel is absolutely correct. The administrative law judge on the second application did have different evidence. But you know what that different evidence was? It's exactly what's missing here. The administrative law judge called an orthopedist who reviewed the entire record, who testified at the hearing, who was subject to cross-examination. And nothing could more clearly indicate the deficiency of the present decision than that. Well, but we can't import that into this. No, I'm making just a logical point that when you say there's different evidence, there is. But it shows the deficiency of this decision. I'm not saying this Court needs to rely on that. That's a done deal. Decision's already been rendered. Are you claiming, are you arguing that the ALJ should have, didn't, didn't, was deficient in making the record? I didn't read that in the brief. Yes, I very specifically say in the brief, Judge, that this Court has never held that the opinion of a non-examining physician who did not testify at the hearing was substantial evidence. The best case on that, and I see my red light's gone off, so just let me finish this sentence. The best case on that is Andrews. It's 53-1335. Indirect. Indirect. And it says, because she was subject to cross-examination, the non-examining physician's opinion is substantial evidence. Thank you. Thank you. The case is argued as a decision. We'll hear the next case, which is Morgan v. the County of Yolo. Thank you, Your Honor. Thank you.
judges: Schroeder, Clifton, Callahan